UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
DAMION BERGER and SCI GOLDEN HOUR,    :
                                      :
            Plaintiffs,               :
                                      :          Case No. 1:26-cv-3186
      -against-                       :
                                      :
CRÉDIT AGRICOLE GROUP, CRÉDIT         :          **COMPLAINT**
AGRICOLE S.A., CRÉDIT AGRICOLE        :
CORPORATE AND INVESTMENT BANK,        :          **JURY TRIAL DEMANDED**
CRÉDIT AGRICOLE SECURITIES (USA),     :
INC., CRÉDIT AGRICOLE AMERICA         :
SERVICES, INC., and CFM INDOSUEZ      :
WEALTH,                               :
                                      :
            Defendants.               :
------------------------------------------------------------- X

Plaintiffs Damion Berger ("Berger") and SCI Golden Hour ("SCI" and together with Mr. Berger, "Plaintiffs"), by their undersigned attorneys, allege upon personal knowledge with respect to themselves, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.    Plaintiffs bring this action against Crédit Agricole Group ("Credit Agricole Group"), Crédit Agricole S.A. ("Credit Agricole S.A."), Crédit Agricole Corporate and Investment Bank ("CACIB"), Crédit Agricole Securities (USA), Inc. ("CA Securities USA"), Crédit Agricole America Services, Inc. ("CA Services"), and CFM Indosuez Wealth ("CFM") for violations of the Commodity Exchange Act, 7 U.S.C. §§ 9, 25, and Commodity Futures Trading Commission ("CFTC") Rule 180.1, 17 C.F.R. § 180.1(a); violations of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j, 78cc, and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5; and for fraudulent misrepresentation, inducement, and

1

concealment, conversion, civil theft, and/or unjust enrichment.

2. This action arises from a years-long scheme in which Defendants fraudulently induced Plaintiffs into multi-currency credit facilities collateralized by U.S. listed equity securities, falsely represented that a combination of equity options and FX forwards/swaps would create a "perfect hedge" eliminating all valuation and FX risk and any possibility of margin calls, then executed transactions that increased exposure, concealed a structural shortfall that existed prior to execution of the agreements, manipulated valuations, cut-off access to drawable lines of credit, refused to execute correcting transactions, and ultimately forced the liquidation of the Collateral Securities through their New York broker on stock exchanges located in New York.

3. Between 2017 and 2022 Mr. Berger and SCI entered into a series of multi-currency credit facilities with CFM and Credit Agricole with credit granted in Euros ("EUR") that were collateralized with U.S. equity shares denominated in U.S. Dollars ("USD") and trading on markets or exchanges in the U.S., including thousands of shares of Tesla, Inc. ("Tesla") common stock. Pledging equity securities as collateral creates a potential valuation risk as the price of the security trades on an open market and fluctuates up and down at any given time. Pledging securities that are denominated in USD as collateral on a multi-currency credit facility further creates an exposure to the EUR/USD exchange risk. Accordingly, the credit agreements had margin provisions requiring Plaintiffs to maintain adequate collateral at all times or face a margin call.

4. CFM approached Plaintiff with a complex trading strategy that would purportedly hedge both the valuation and foreign exchange ("FX") risks. CFM told Plaintiffs that they could provide a risk-free "no-margin-call" solution consisting of a combination of long put options on Tesla shares (contractually required to maintain 100% weighted pledge value) and FX forward / swap transactions that would purportedly eliminate both valuation and EUR/USD FX risks. In

recorded calls, CFM repeatedly assured Mr. Berger in his native English language that the strategy was "fully hedged," "self-financed," and carried "no risk of margin call." However, these representations were false. In reality, CFM executed transactions in the interest of Defendants, not Plaintiffs, that increased Plaintiffs' exposure and created hidden liabilities which guaranteed that margin calls and forced liquidations would occur.

5.      Defendants further falsified losses to overstate Plaintiffs' liabilities, used artificial and blended exchange rates and valuations to undervalue Plaintiffs' collateral and conceal structural failures, failed to execute Plaintiffs' explicit trading instructions to hedge exposure against an unjustified margin-call, prematurely called in credit facilities, overcharged millions of dollars of penalties and penalty interest, and ultimately forced the liquidation of Plaintiffs' pledged securities, including 75,000 Tesla shares, causing tens of millions of dollars in damages.

6.      For these reasons and as set forth in detail herein, Plaintiffs seek damages resulting from the Defendants' violations of law and equity, in an amount to be determined at trial.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 because Plaintiffs' claims raise federal questions under the Exchange Act and the Commodity Exchange Act.  This Court has supplemental jurisdiction over Plaintiffs' common law claims pursuant to 28 U.S.C. § 1367(a).

8.      This Court has personal jurisdiction over each Defendant because they have sufficient minimum contacts with New York as to render the exercise of jurisdiction over each Defendant by this Court permissible under traditional notions of fair play and substantial justice.

9.      Venue is proper in this District under 28 U.S.C. § 1391, because Defendants reside and/or have a place of business in this County. Moreover, the ultimate harm suffered by

Plaintiffs—the liquidation of Collateral Securities—took place in this District and there are witnesses and evidence necessary and essential to the prosecution of this action located in this District.

## PARTIES

10.     Plaintiff Damion Berger is a citizen of the United Kingdom and a victim of Defendants' fraudulent scheme.

11.     Plaintiff SCI Golden Hour is a company incorporated under Monegasque law owned by Mr. Berger and a victim of Defendants' fraudulent scheme.

12.     Defendant Crédit Agricole Group ("Credit Agricole Group") is one of the largest financial institutions in Europe and the parent holding company for numerous Credit Agricole entities, including each of the Defendants named below.

13.     Defendant Crédit Agricole S.A. ("Credit Agricole S.A.") is a French banking company that controls a large complex financial organization that consists of a number of separate business lines and legal entities in many countries around the world. Credit Agricole S.A. is the banking arm of the Credit Agricole Group. Significant portions of Credit Agricole S.A.'s U.S. core business lines are conducted through CACIB NY Branch, including Global Markets Division, Energy & Real Assets Division, Corporate & Leveraged Finance Division, and International Trade and Transaction Banking Division. Nonparty Eric Vial serves as the Chairman of the Board of Directors of Credit Agricole S.A.

14.     Defendant Crédit Agricole Corporate and Investment Bank ("CACIB") is the corporate and investment banking arm of the Credit Agricole Group with thousands of employees and numerous offices across 33 countries in Europe, Asia, and the Americas, including an office in the Crédit Agricole CIB Building in New York, NY. CACIB NY Branch located at 1301 Avenue

of the Americas, New York, NY 10019 operates pursuant to a branch license granted by the New York Department of Financial Services ("NYDFS") and is permitted to engage in a full range of banking activities generally permitted for all banks operating under NYDFS licenses within New York State. CACIB NY Branch is a branch of CACIB and, as such, is not a separate legal entity.

15. Defendant Crédit Agricole Securities (USA), Inc. ("CA Securities USA") is the Credit Agricole Group's registered U.S. brokerage firm, registered with the U.S. Securities and Exchange Commission ("SEC"), with its principal place of business located at 1301 Avenue of the Americas, New York, NY 10019—otherwise known as the Crédit Agricole CIB Building. As the only Credit Agricole broker registered with the SEC, CA Securities USA is the only entity in the Credit Agricole Group allowed to execute trades in the U.S. equities markets. CA Securities USA engages in a broad range of investment banking and securities activities in the U.S., including debt and equity underwriting, debt sales and trading, and corporate finance advisory services for domestic and foreign institutions. CA Securities USA is a New York corporation wholly-owned by CACIB.

16. Defendant Crédit Agricole America Services, Inc. ("CA Services") provides support services for the business activities of CACIB NY Branch and CA Securities USA. CA Services is a New York corporation wholly-owned by CACIB.

17. Defendant CFM Indosuez Wealth ("CFM") is the wealth management arm of Credit Agricole Group located in Monaco. CFM is a subsidiary of CACIB. CFM and CACIB share resources including servers, IT and cybersecurity resources, and trade execution services. CFM states in its annual report that the management of their activities and their organizational structure "are based on the strategy, policies, decisions and general authorisations [sic], rules of operation and best practices set by Crédit Agricole Group . . . ." Nonparty Eric Vial, Chairman of the Board

of Credit Agricole S.A., as served as Chairman of the Board of CFM since May 19, 2022 and as a Director since March 12, 2020.

18.     Together, Defendants Credit Agricole Group, Credit Agricole S.A., CACIB, CA Securities USA, and CA Services are herein referred to as "Credit Agricole" and together with CFM, "Defendants."

## FURTHER SUBSTANTIVE ALLEGATIONS

### I.     The Credit Agreements and Collateral Securities

19.     In March 2017, Mr. Berger opened a client account with CFM accompanied by a pledge of currencies and/or financial instruments. The agreement between the parties required that Mr. Berger always maintain a weighted value of pledge assets equal to at least 100% of any credit amount outstanding (valuation risk) and applied an additional margin requirement to cover exchange rate risks for pledged assets that are denominated in different currencies than the credited currency (FX risk). Failure to offset these valuation and FX risks would allow CFM to take control of the pledged assets and sell them.

20.     In April 2018, Mr. Berger executed a multi-currency credit facility with CFM with a maximum amount of 1,500,000 EUR.

21.     In August 2018, Mr. Berger executed a multi-currency credit facility with CFM with a maximum equivalent value of 3,000,000 EUR, which cancelled and replaced the April 2018 Credit Facility. The August 2018 Credit Facility contained the following language: "The pledged assets may wholly or partly comprise securities managed and/or distributed directly and/or indirectly by THE BANK, the Credit Agricole Group and/or their subsidiaries."[1]

22.     In 2020, Mr. Berger purchased 25,000 shares of Tesla common stock to serve as

---

[1] This translation was provided as part of the original document.

pledged collateral.[2]

23.    In December 2020, Mr. Berger approached CFM to discuss financing the acquisition and future construction of a euro-denominated real estate property using a mix of mortgage and collateral-backed loans. CFM, not being a traditional mortgage or construction lender, expressed interest in providing the collateral-backed portion of the financing and brought in its parent bank, Credit Agricole, to negotiate the mortgage and construction portion of the loans. An intertwined credit facility was negotiated in tandem with CFM and Credit Agricole.

24.    On February 2, 2021, Credit Agricole issued a formal credit approval letter that was later amended by a second credit approval letter on March 9, 2021. Instead of requiring Plaintiffs to post additional collateral or split the collateral between the parent and subsidiary, CFM and Credit Agricole executed intra-bank agreements for the existing collateral to guarantee the Credit Agricole facilities. Importantly, the credit approval letters conditioned the funding of the loans on CFM first funding the Credit Agricole guarantees.

25.    On February 2, 2021, acting on advice from CFM to preemptively secure the collateral for the anticipated loans agreements that were in the process of being formally approved by CFM, Plaintiffs purchased a put option on 25,000 shares of Tesla (75,000 shares post-split), with a strike of $550 and maturity date of January, 20, 2023, which guaranteed a floor value of 13,750,000 USD. Plaintiffs were told by CFM that purchasing the put options with a 13,750,000 USD floor value would be more than sufficient to cover all the anticipated loans agreement.

26.    On May 6, 2021, Mr. Berger and SCI entered into a series of agreements with Credit Agricole and CFM, including:

---

[2] On August 25, 2022, Tesla common stock underwent a 3-for-1 stock split increasing the number of Tesla shares in the Collateral Securities from 25,000 to 75,000.

(i)   a mortgage-backed loan with Credit Agricole for 5,500,000 EUR, consisting of a €4.5M portion for real estate acquisitions and €1M portion drawable by Plaintiffs for construction (the "Mortgage-Backed Loan");

(ii) a conditional construction loan facility with Credit Agricole for 5,000,000 EUR (the "Conditional CA Credit Facility");

(iii) a bullet loan agreement with CFM for 2,000,000 EUR (the "Bullet Loan");

(iv) a multi-currency credit facility with CFM for a maximum equivalent value of 3,600,000 EUR (the "Multi-Currency Credit Facility"); and

(v) a commitment by signature of a payment guarantee to be issued in favor of Credit Agricole for 5,000,000 EUR made in connection with the Conditional CA Credit Facility (the "GAPD" and together with the Mortgage-Backed Loan, the Conditional CA Credit Facility, the Bullet Loan, and the Multi-Currency Credit Facility, the "May 2021 Credit Agreements").

27.     The GAPD for 5,000,000 EUR was never signed by CFM in favor of Credit Agricole. A First Demand Guarantee can only "be activated" on condition that it has been signed beforehand between the parties, this unsigned GAPD did not bind CFM and could not constitute a Secured Claim, for lack of producing any obligatory relationship between the parties.

28.     The May 2021 Credit Agreements cancelled and replaced the August 2018 Credit Facility. In derogation from the bank's standard weighting value, these agreements required that Mr. Berger always maintain a weighted value of pledge assets equal to at least 100% of any credit amount outstanding, on account of the "perfect hedge" conditioned in the loan agreements.

29.     The May 2021 Credit Agreements noted that "the assets thus pledged may consist, in whole or in part, of marketable securities managed and/or distributed directly and/or indirectly

8

by the BANK, the Crédit Agricole Group, and/or their subsidiaries."[3]

30.    The Bullet Loan of 2,000,000 EUR and the Multi-Currency Credit Facility of 3,600,000 EUR, signed on 6 May 2021, stipulated strict rules relating to the maintenance of coverage on the exposure to TESLA shares, in the following terms:

> Maintain one or more long positions in put option(s) ("PUT(s)") with an option exercise price ("STRIKE") enabling the weighted pledge value to be maintained at the derogatory rate of 100% of the total amount of the Guaranteed Claims as required throughout the duration of its credit commitments. For illustration purposes, on the date of signature hereof, the characteristics of the options purchased are as follows:
>
> PUT on 25,000 "TESLA" shares with a first maturity date of 20 January 2023;
>
> Strike "550" enabling coverage at maturity of the amount of the Guaranteed Claims requested, i.e.: 25,000 * 550 = 13,750,000 USD.

31.    To collateralize these credit agreements, Plaintiffs used a portfolio of equity securities, including 75,000 shares of Tesla, 1,000 shares of Niu Technologies, 1,810 shares of NIO Inc., 1,500 shares of Li Auto Inc., 1,000 shares of XPeng Inc., 1,500 shares of Luminar, and 2,000 shares of QuantumScape Corporation (collectively, the "Collateral Securities").

32.    Tesla shares trade in USD on the Nasdaq Stock Market under the ticker symbol TSLA. To comply with the explicit terms of the agreements, Plaintiffs purchased put options on 25,000 shares of Tesla (equivalent to 75,000 shares post-split), with a strike of $550 and maturity date of January 20, 2023 for a total cost of $3,986,600. This put option guaranteed a floor value of 13,750,000 USD if the Tesla price was below $550 at maturity of the contract.

33.    Niu Technologies shares trade in USD on the Nasdaq Stock Market under the ticker symbol NIU.

34.    NIO Inc. shares trade in USD on the New York Stock Exchange under the ticker

---

[3] This text has been translated from the original French.

symbol NIO.

35.    Li Auto Inc. shares trade in USD on the Nasdaq Stock Market under the ticker symbol LI.

36.    XPeng Inc. shares trade in USD on the New York Stock Exchange under the ticker symbol XPEV.

37.    Luminar Technologies formerly traded in USD on the Nasdaq Stock Market under the ticker symbol LAZR. It was delisted from the Nasdaq Stock Market on December 24, 2025, and trades on the OTC Market under the ticker symbol LAZRQ.

38.    QuantumScape Corporation shares trade in USD on the Nasdaq Stock Market under the ticker symbol QS.

39.    Accordingly, by using marketable equity securities denominated in USD, Plaintiffs were now subject to the valuation and FX risks provisions.

## II.    Defendants Fraudulently Induce Plaintiffs into the Hedging Strategy Transactions, Which Ultimately Cause a Margin Call and Liquidation of the Collateral Securities

40.    Between January 2021 and May 2021, while Mr. Berger was negotiating the May 2021 Credit Agreements with CFM and Credit Agricole, CFM approached Mr. Berger with options and forward contract transactions that they told him would eliminate FX and valuation risks and hedge his positions. At the insistence of Defendants, these transactions were put in place ahead of the final execution of the Credit Agreements on May 6, 2021, and were purportedly designed in furtherance of the agreements with CFM and Credit Agricole.

41.    On February 2, 2021, Mr. Berger purchased put options on 25,000 Tesla shares (equivalent to 75,000 shares post-split) at an exercise price of 550 USD, maturing on January 20, 2023 (the "Tesla Put Options").

42.    Also on February 2, 2021, Plaintiffs wired approximately €596,125 as a notary

deposit that was scheduled to be refunded no later than May 10, 2021, in connection with the real estate transactions contemplated by the forthcoming Mortgage-Backed Loan with Credit Agricole.

43.    Beginning in March 2021, CFM began pushing more complex, purportedly hedging, transactions. However, each of these transactions was either in the interest of Defendants, against the interest of Plaintiffs, or erroneously placed and covered-up.

44.    On March 4, 2021, CFM purchased on Mr. Berger's client account 1,457,016 EUR against 1,755,413 USD at a rate of 1.2048, with a maturity date of March 8, 2021, purportedly as a hedge. However, the spot transaction operated in the opposite direction and created an asset-liability mismatch relative to Plaintiffs' USD-denominated collateral.

45.    On March 11, 2021, a CFM trader approached Mr. Berger with a hedge transaction "[s]o you are no longer exposed to the fall of the US dollar. . . ."

46.    That same day, CFM purchased on Mr. Berger's client account 596,185 EUR against 714,110 USD at a rate of 1.1978, with a maturity date of March 15, 2021. However, in reality, the March 11, 2021 transaction artificially created an exchange risk that did not exist beforehand, by converting the notary debit intended to be reimbursed in Euros into a debit in USD.

47.    Yet, the payment of the temporary notary deposit should in no way have been taken into consideration by CFM in developing the strategy to cover Plaintiffs' exposure in the first place. The notary deposit paid in February 2021 was not intended to remain a definitive disbursement but constituted a provisional advance that was refundable upon the execution of Mortgage-Backed Loan Agreement with Credit Agricole. This fact was expressly communicated to both CFM and Credit Agricole during the negotiations for the May 2021 Credit Agreements.

48.    As soon as a credit was granted in EUR while the pledged securities were denominated in USD, an exposure to the EUR/USD exchange risk was mechanically created. By converting a debit balance in EUR to a debit balance in USD CFM created exposure to Plaintiffs whereby a decline in the EUR/USD rate mechanically increases the EUR value of the liability expressed in USD, which could generate an overrun of the contractual credit ceiling and trigger a risk of non-coverage or a margin call.

49.    On March 11, 2021, CFM purchased 1,400,000 EUR against 1,678,740 USD at a rate of 1.1991, with a maturity date of May 3, 2021.

50.    An input error causes the operation to be recorded on sub-account 0000 instead of client account 0001. These initial recording errors constitute a stdructural fault on the part of CFM, creating operational confusion and an artificial exposure prior to the execution of the May 2021 Credit Agreements.

51.    On April 12, 2021, CFM orchestrated two transactions to reverse the input error of March 11: (i) a sale of 596,185 EUR against 714,110 USD at a rate of 1.1978 on sub-account 0000; and (ii) a purchase of 596,185 EUR against 714,110 USD at a rate of 1.1978 on client account 0001. The two transactions have a retroactive value date of March 15, 2021.

52.    On April 20, 2021, Laurent Jeannel (LJL) and Mr. Berger (DB) had a transcribed telephonic conversation during which Mr. Jeannel plainly told Mr. Berger that the hedging strategy would "result in no risk of margin call":

> **LJL**: This covers all your loans… A little less than the value of the put option.
> …
> **LJL**: you have already covered […] your three and a half million that you're using . . . So, in sum, what remains to be covered and only, for the CFM guarantee, which means for 5 million.
> …
> **LJL**: Ok? So, to hedge the Euro/Doll will, will allow you to be very calm, because you will have no risk of margin call.

**DB**: But but, let me just understand this for a second, because CFM gives a guarantee of 5 million to Crédit Agricole?

**LJL**: Yes.

but when I repay the loan, I only repay the loan to Crédit Agricole and not to CFM?

**LJL**: Yes.

so um, I am trying to get an idea…

**LJL**: Yeah, yeah.

**DB**: what is the advantage, what is the advantage of covering a guarantee and that you, that you do not expect to be called one day?

**LJL**: Well—let's say—we need to have, in our books—or for you, in your account—the ability to guarantee 5 million at all times.

**DB**: Of course, of course—so it's more about that. Yeah, yeah, it's not really about the repayment; rather, it's about... well, it's about the margin call thresholds.

**LJL**: Yes, yes, yes—this is regarding the margin call. This means that if the dollar falls, we will say to you: "Okay, regarding the collateral—what can you do?" Therefore, there will be a margin call.

…

**LJL**: Eh, 12.5, it is in US dollars. Everything will be hedged, no risk for the PUT. Eh, 12.5, and you, you will have, the PUT gives you 13, 13.75. 13,750,000, ok?

…

**LJL**: euros, yes. 1.2, 1.2 million euros, it is your free, eh, technical account, eh, when we do the account, you know, you must… Eh, ok, and then we have the situation where you have no margin call etc.

…

**LJL**: We are going to do what we call a swap. We are going to sell euros spot and repurchase euros at the term price. Ok?

…

**LJL**: It is something that you will not use, but that you will keep for a potential, you know. We think that the 1.2 million, you will have available…

…

**DB**: ok.

…

**LJL**: when we are going to renew the swap in 2 years, we will renew it at the spot position in two years. And this, but even if, as you say, at the end of the operation, it will be the same thing.

…

**LJL**: voila, but that, that, that allows not to have euro margin call then.

…

**LJL**: When we are in dollars, in fact we have, well it works, that is to say that we have well saved… 10% of the amount of the credit. In addition.

…

**LJL**: Without having any impact.

…

**LJL**: Euh, and without having a risk of margin call. But I had had, I had in my reasoning at the beginning, the guarantee as we cannot… we are not going to do it spot, we are not going to do, euh, we are obliged to do a forward exchange, and so

13

euh, we are obliged to take these flows into account.

53.    Immediately after the call, CFM purchased on Mr. Berger's client account 5,000,000 EUR against 6,127,500 USD at a rate of 1.2255, with a maturity date of January 20, 2023.

54.    In stark contrast to the guarantees of removing any risk of margin call through a perfect hedge of the Euro/dollar risk, including repeated assurances of "no risk of margin call" and "everything will be hedged," made by Laurent Jeannel to Mr. Berger, the April 20, 2021 transaction was executed primarily to protect Defendants' own exposure on the unsigned €5M GAPD. The transaction was not neutral, it was directional and speculative in nature on the USD/EUR parity and increased exposure to FX risk. In the event of a fall in the EUR/USD rate (i.e. a depreciation of the EUR against the USD), this transaction would entail a mark-to-market loss value that would cause an additional increase in the claims guaranteed by CFM.

55.    This transaction represents a crippling conflict of interest on behalf of Defendants. The forward exchange operation of 5,000,000 EUR allowed Defendants to lock, from April 2021, the euro value of the guarantee between CFM and Credit Agricole. However, this guarantee was never formalized nor signed and the transaction was housed in Mr. Berger's account. In fact, the Conditional CA Credit Facility underlying the GAPD was never actually issued or requested to be drawn upon by Plaintiffs. CFM aligned the coverage on Defendants' hypothetical exposure without taking into account Plaintiffs' legitimate objective. The currency operations implemented prioritized the interests of Defendants, to the detriment of Plaintiffs.

56.    Notably during the call, almost all the strongest assurances of hedging were given in English, Mr. Berger's native language. It is only after the conversation switched to French, and immediately after having reaffirmed "without having any impact" and "without having a risk of

14

margin call", that the bank operates a subtle change towards a "forward exchange."

57.     Moreover, on April 20, 2021, CFM sent Mr. Berger a list of the EUR/USD transactions executed on his account on the same date. Among them appears the following transaction: "5'000'000 EUR @ 1,2255 Term (20th April / Value date 20th May 2023)". Yet the value date stated is incorrect: it should have been January 20, 2023, not May 20, 2023.

58.     On May 3, 2021, CFM sold on Mr. Berger's client account 1,400,000 EUR against 1,687,000 USD at a rate of 1.2050, with a maturity date of May 3, 2021.

59.     On May 3, 2021, CFM purchased on Mr. Berger's client account 1,400,000 EUR against 1,687,420 USD at a rate of 1.2053, with a maturity date of May 10, 2021.

60.     On May 6, 2021, immediately preceding the signing of the May 2021 Credit Agreements, Laurent Jeannel (LJL) and Mr. Berger (DB) had another transcribed telephonic conversation, wherein Mr. Jeannel explicitly returned to the spot "swap" strategy that he had initially presented in English on April 20, 2021 by affirming that there was "no major change" and that "it is the same thing":

> **LJL**: "We must swap the 2m€ that we have done until Monday's date. […] That you will have all the hedging on Forex which will have the same maturity on January 20, 2023 as the PUT."

> **LJL**: "it is not what we had […] but as on the SCI we do it by means of a forward currency contract, it is different from what we said, but no major change."

> **DB**: "There is nothing more, you know, it is the same strategy, what we are doing, it is the same thing, isn't it?"

> **LJL**: "Yes exactly."

61.     On that same call, Mr. Jeannel again assured Mr. Berger "[t]hat you will have full coverage on forex […] At least you are covered no matter what the Euro/dol does, you are covered," and that the swap was "the same thing" as the previously promised hedging strategy

15

that comprised the 5,000,000 EUR forward exchange transaction. These statements reaffirmed Plaintiffs' reliance on Defendants' statements that the Hedging Strategy Transactions were in fact spot swap agreements designed to eliminate any FX and valuation risks under the May 2021 Credit Agreements, not speculative forward transactions that protected Defendants' interests and exposed Plaintiffs to FX risk-based default.

62.     After the call, CFM executed the following transaction: (i) CFM sold on Mr. Berger's client account 2,000,000 EUR against 2,410,000 USD at a rate of 1.2050, with a maturity date of May 10, 2021; and (ii) CFM purchased on Mr. Berger's client account 2,000,000 EUR against 2,782,000 USD at a rate of 1.3910, with a maturity date of January 20, 2023.

63.     However, the forward purchase rate of 1.3910 on the second leg of the transaction was erroneous, at over 13% higher than the actual market rate of 1.2236 on the day, generating an immediate mark-to-market loss of 274,000 EUR on Mr. Berger's client account which further increased the liabilities on his account in excess of the value of his collateral without his knowledge. Both legs of the swap transactions were reversed five days later.

64.     On May 11, 2021, to correct the May 6 purchase rate error CFM reversed the two exchange transactions and replaced them with the following transactions: (i) CFM sold on Mr. Berger's client account 2,000,000 EUR against 2,410,000 USD at a rate of 1.2050, with a maturity date of May 10, 2021; and (ii) CFM purchased on Mr. Berger's client account 2,000,000 EUR against 2,447,200 USD at a rate of 1.2236, with a maturity date of January 20, 2023.

65.     Collectively, the March 4, 2021, March 11, 2021, April 12, 2021, April 20, 2021, May 3, 2021, the May 6, 2021, and the May 11, 2021 transactions are referred to as the "Hedging Strategy Transactions." Several of these transactions contained directional, input, and account errors—in addition to the conflicts of interest discussed above. The Hedging Strategy

Transactions were repeatedly misrepresented to Plaintiffs as risk-free. In truth, they created artificial FX exposure, prioritized Defendants' needs over Plaintiffs' interests, and formed part of a larger scheme that guaranteed the very margin call and forced liquidation Defendants had promised to prevent.

66.     At first glance, the Tesla Put Options—transacted in February 2021 and required by the terms of the May 2021 Credit Agreements—appear to serve the interests of both Plaintiffs and the interests of Defendants. Absent further context, the Tesla Put Options protect the value of the Tesla shares pledged by Plaintiffs as part of the Collateral Securities up to $13,750,000 USD. However, a more in-depth analysis reveals that this protection remains valid only if the value of Plaintiffs' outstanding exposures did not exceed this amount.

67.     In the absence of any effective hedge for the May 2021 Credit Agreements, each use of the credit lines in EUR increased Plaintiffs' exposure to EUR/USD currency risk.

68.     Instead of providing "full coverage on forex risk" "no matter what" EUR/USD exchange rates do, the Hedging Strategy Transactions did the exact opposite and mechanically created FX risk that would not have otherwise existed. The Hedging Strategy Transactions directly resulted in the total amount of Plaintiffs' commitments exceeding the value of the $13,750,000 USD Tesla Put Options.

69.     Moreover, Defendants knew on the date of signature of the May 2021 Credit Agreements that due to the Hedging Strategy Transactions, the value of the Collateral Securities was already insufficient under the terms of agreements. In other words, the Defendants knew, but failed to inform Plaintiffs, that Plaintiffs were executing underwater contracts.

70.     On May 5, 2021, Defendants had an analysis "Estimation of the pledge" performed which Defendants omitted from the annex of the agreements provided to Plaintiffs

17

prior to execution of the May 2021 Credit Agreements. The Estimation of the pledge would have revealed to Plaintiffs the structural insufficiency of the May 2021 Credit Agreements from their origin. However, Defendants intentionally withheld this valuation from Plaintiffs to cover up the FX losses they had caused through the Hedging Strategy Transactions. Further, Defendants had an interest in having Plaintiffs execute the May 2021 Credit Agreements to avail themselves of the guarantees therein to cover the liquidity losses caused by the Hedging Strategy Transactions.

71.     In sum, the deterioration in the ratio between assets and liabilities resulted exclusively from the implementation and maintenance of Hedging Strategy Transactions, which Defendants knew prior to execution of the May 2021 Credit Agreements. If Defendants had implemented an actual, appropriate hedging strategy, the value of the collateral provided by Plaintiffs would never have been lower than the amount of the guaranteed claims.  The resulting margin call and its consequences would not have occurred but for the false and misleading Hedging Strategy Transactions.

**III.     Defendants Force a Margin Call and Liquidate the Plaintiffs' Collateral Securities**

72.     On September 14, 2021, CFM advised Mr. Berger during a transcribed telephonic call to carry out a "roll" of Tesla call options, shifting their maturity from June 2022 to January 2023, for liquidity reasons—and not from a speculative perspective:

> By doing… by doing it like that, you will also have a little more excess liquidity
> …
> the, the very good news is that you will obtain liquidity, you will have the 550,000, you will cont… you will continue to gai… time will play in your favour and the disadvantage of the strategy will be that it will be a little more difficult to renew the strategy.
> …
> Okay. But you must also be aware that you, you need some liquidity.

73.     What CFM failed to tell Plaintiffs was that this current need for liquidity resulted directly from the losses generated by the unfavorable mark-to-market of the EUR/USD rate

(engineered by the Hedging Strategy Transactions), which had declined significantly since the inception of these transactions in March 2021. Moreover, these losses had the mechanical effect of increasing Plaintiffs' outstanding exposures, in accordance with the mechanism of the April 20 Forward Exchange of 5,000,000 Euros.

74.     Similarly, CFM did not inform Plaintiffs that the resulting increase in their outstanding exposures had placed them in excess of the value of their pledged collateral since the moment he signed the loan agreements on May 6, 2021, thereby hiding the fact that their Credit Agreements had been in technical default for the past four months.

75.     Furthermore, this need for liquidity directly contradicted the statements made by the CFM bank representatives at the time the hedging strategy was put in place that no margin call situation was to be expected.

76.     On September 14, 2021, Plaintiffs executed CFM's suggested strategy to "roll" their Tesla options: purchase 250 TESLA calls expiring June 2022, at strike price $1,400 USD and sell 250 TESLA calls expiring January 2023, at strike price $1,400 USD. These transactions ultimately resulted in an opportunity loss of $2,993,413.39 USD.

77.     The "roll" operations of the call options had the effect of extending their expiration from June 2022 to January 2023. Because CFM does not allow the holding of uncovered optional positions, the "roll" extended the maintenance of the underlying shares on cover for the entire period. This maintenance, in turn, reduced (if not eliminated) Plaintiffs' ability to sell covered call options, finance the sale of call options, or respond to margin calls and demands for reconstitution of collateral without requiring additional liquidity.

78.     After the "roll' liquidity conversation with CFM, Mr. Berger grew suspicious about the financial health of Plaintiffs' collateralized credit agreements and arranged meetings

with his CFM account advisors in October and November 2021. During those meetings, Plaintiffs were informed for the first time of losses on the EUR/USD rate hedging transactions on their account. Wishing to understand the origin of these losses—which were incompatible with the promised "perfect hedge" strategy—Mr. Berger questioned CFM about the Hedging Strategy Transactions and his level of exposure to the EUR/USD exchange rate.

79.    On October 5, 2021, CFM allegedly lowered the margin requirement on foreign exchange operations from 10% to 7%. Rather than incorporating this change into its general conditions and applying it to all clients, CFM applied the reduction only to Plaintiffs' account and without directly informing them.

80.    CFM had never informed Plaintiffs of any margin requirement at the time it proposed, and he agreed to enter into, the combined 7,000,000 EUR of Hedging Strategy Transactions. CFM had promised Plaintiffs a "perfect hedge" strategy. They represented to Plaintiffs that the Hedging Strategy Transactions would eliminate a 10% hold-back to cover FX risk and permit a 100% weighting of the $13,750,000 USD value of the Tesla Put Options instead of a 90% weighting. Furthermore, CFM failed to disclose that Plaintiffs' liabilities would simultaneously increase by 10% due to undisclosed margin requirements on the very FX transactions that were supposedly designed to eliminate the FX rate risk. This was akin to a strategy that moves one step forward only to take one step back and end up in essentially the same place.

81.    The undisclosed 10% margin requirement, equal to 700,000 EUR, contributed to the deterioration in the ratio between Plaintiffs' assets and liabilities from the moment they entered into the Hedging Strategy Transactions, and further contributed to the structural insufficiency of the pledged collateral from the moment the May 2021 Credit Agreements were

20

executed.

82.    By reducing the margin requirement in October 2021 from 10% to 7% (equal to 490,000 EUR), CFM was engineering the other side of the same coin as the September 14, 2021 Tesla options "roll." Both actions artificially improved the ratio between assets and liabilities and masked the ballooning losses on Plaintiffs account from the EUR/USD rate hedging transactions.

83.    On October 12, 2021, more than five months after the signing of the May 2021 Credit Agreements, a CFM account adviser sent Mr. Berger an excel spreadsheet "Credit Damion.xlsx." The spreadsheet contained a snapshot of the valuation of Plaintiffs' account on that date. Examination of the file reveals several flaws in CFM's valuation.

84.    First, the value of the required pledge is calculated exclusively on the basis of the valuation of the Tesla shares in the hypothesis of the exercise of the Tesla Put Options, converted at an exchange rate of 1.221. The valuation completely fails to account for other valuation components, including the market value of the Tesla shares, the value of the call options, the current account balance, or the valuation of other assets in the Collateral Securities.

85.    Second, the valuation uses an artificial blended EUR/USD rate of 1.221 obtained by aggregation of rates from several hedging operations, some of which had already reached maturity or were no longer relevant to the actual position. This artificial blended EUR/USD rate knowingly undervalued the euro countervalue of the collateral protected by the puts ($13,750,000 USD) by as much as 643,500 EUR, thereby masking the structural shortfall existing from the origin.

86.    Third, the valuation incorporates a "Buffer line" of 400,000 euros which artificially neutralizes the mark-to-market impact of FX, so that in the absence of this adjustment the calculation would have shown a negative balance of -330,261 euros, clearly revealing the

insufficiency of pledge.

87.    Fourth, in light of the aforementioned insufficiency of the pledge as highlighted in the preceding analysis of the spreadsheet, absent the September 14, 2021 "roll" of the Tesla call options — which generated a gain of $623,593 on Mr. Berger's account — the insufficiency of the pledge on October 12, 2021 would have been even larger.

88.    In January 2022, CFM unilaterally reduced the derogating pledge value to 55% in place of the 90% retained. There is no indication that Plaintiffs accepted a new weighting rate of 55% in January 2022.

89.    On March 21, 2022, Credit Agricole agreed to extend the validity period of the (still untouched) 5,000,000 EUR Conditional CA Credit Facility by six months, postponing the first drawdown deadline from May 6, 2022 to November 6, 2022.

90.    On May 6, 2022, Plaintiffs entered into a renewed series of credit agreements with CFM, including a multi-currency credit facility with a maximum equivalent value of 5,500,000 EUR that cancelled and replaced the May 2021 Multi-Currency Credit Facility and an amendment to the Bullet Loan agreement from May 2021 (the "May 2022 Credit Agreements"). Notwithstanding the foreign exchange hedging contracts still in place with maturity in January 2023, the May 2022 Credit Agreements confirmed the removal of any coverage condition relating to all of Plaintiffs' exposures, and confirmed a 55% weighting applicable to the pledged Tesla shares.

91.    Notably, the May 2022 Credit Agreements again omitted the "Estimation of the Pledge" analysis that would have shown that Plaintiffs' positions were upside down prior to the execution of the agreements. As a result, Plaintiffs were deprived of an objective estimate of the value of the pledged collateral that would have revealed its structural insufficiency, and were

22

fraudulently induced for a second time to enter into credit agreements that were in technical default from their inception.

92.     On May 6, 2022, CFM informed Plaintiffs by email that their EUR/USD position "is Long EUR, Short USD, expiry January 20, 2023, at 1.2249, for a nominal of 7,000,000 EUR." That representation was false. Plaintiffs' nominal exposure as "Long" 7,000,000 EUR incorrectly implied that the corresponding foreign-exchange hedging transactions, for 5,000,000 EUR and 2,000,000 EUR, respectively, were both forward exchange contracts. In reality, the 2,000,000 EUR contract was a neutral non-directional swap contract and not a forward contract, and was therefore neither long nor short.

93.     On May 10, 2022, Plaintiffs signed a loan modification with Credit Agricole on the 5,500,000 EUR Mortgage-Backed Loan (€1,000,000 of which was a nearly untouched drawable line of credit) extending the interest-only period to 48 months following the initial disbursement of funds on May 7, 2021.

94.     On May 25, 2022, during a telephonic conversation between a CFM and Mr. Berger, CFM informs Plaintiffs for the first time that their portfolio is in shortfall and nearing a margin call level: "The portfolio situation as of today is in shortfall and not in margin call and the TSL level that triggers the margin call today is slightly below 600. This price may fluctuate depending on market conditions (Forex)." The CFM account advisor further advised Plaintiffs to make even more radical Tesla option transactions to supplement his collateral and reduce the likelihood of a margin call: "If you buy 90 puts on Tesla shares with a strike of 550 to add to your overall position, this margin call price should decrease."

95.     On August 9, 2022, Credit Agricole refused to release the remaining available balance of slightly less than 1,000,000 EUR available to Plaintiffs under the Mortgage-Backed

Loan. In refusing access to valid and open credit facilities, Credit Agricole exerted intense financial pressure on Plaintiffs amid their ongoing valuation dispute(s) with CFM. By blocking essential liquidity precisely when Plaintiffs most needed resources to address the artificial collateral shortfall created by the Hedging Strategy Transactions, this action further impaired Plaintiffs' ability to reconstitute collateral, cure margin issues, or avoid the margin call and forced liquidation of the Collateral Securities that Defendants had promised would never occur. This coordinated conduct across subsidiaries formed part of Defendants' overarching scheme.

96.     On October 5, 2022, CFM sent Plaintiffs a formal letter issuing a margin call: "In the absence of action on your part, your positions will be unwound at maturity with an estimated debtor position at maturity of USD -1,600,000 as at 21 September 2022, reducing the value of your collateral accordingly."

97.     Therein, CFM provided mark-to-market values supposedly reflecting the valuation of Plaintiffs' derivative contracts, but obfuscated the valuations by relying on "discount factors" known only to CFM, providing inconsistent values that do not correspond to the prevailing exchange rates, and omitting that the currency swap contract does not generate any net exposure to the exchange rate.

98.     CFM's estimate of the debtor position in the amount of -1,600,000 USD at the maturity date of January 20, 2023 was inaccurate. This estimate was based on an incomplete analysis: it failed to account for the offsetting flows generated by spot leg of the 2,000,000 EUR currency swap and therefore includes a corresponding loss of 493,962 USD that could not occur in a proper valuation of the foreign-exchange hedging contracts at maturity.

99.     In providing an incorrect estimate of Plaintiffs' exposure to the EUR/USD exchange rate, CFM made further false and misleading statements and prevented Plaintiffs from

24

having the elements necessary to make informed decisions regarding the management of their portfolio and collateral.

100.    On November 10, 2022, CFM sent a letter to Plaintiffs confirming that the guarantee coverage of the credit facility is in default and informing them that liquidation threshold for the Collateral Securities had been reached.

101.    On November 25, 2022, Plaintiffs sent CFM the Preliminary Marcum Report dated November 22, 2022, which showed an  accurate valuation of the positions.

102.    On November 30, 2022, amid the margin-call pressure that had been created by the defects in the Hedging Strategy Transactions, CFM sent Plaintiffs a letter offering to reconstitute the pledge by increasing the weighting value conferred on the Tesla shares from 55% to 70% and by purchasing additional put options on Tesla shares. Critically, CFM expressly conditioned this "derogatory agreement" on the prior approval of Credit Agricole.

103.    On December 2, 2022, CFM confirmed the foregoing offer in writing, again stating: "We have considered, subject to the agreement of our Group, increasing the pledge value conferred on the TESLA share from 55% to 70%." Plaintiffs accepted the proposal.

104.    In connection with the derogatory agreement CFM proposed the purchase of additional protective put options (approximately 750 puts with strikes of $135 and a January 20, 2023 expiry) to reconstitute and strengthen the collateral coverage.

105.    Plaintiffs agreed to increase the pledge value conferred on the Tesla shares from 55% to 70% and the purchase of additional put options to reconstitute and strengthen the collateral coverage and authorized CFM to execute the transaction.

106.    Notwithstanding Plaintiffs' acceptance and clear, repeated trading instructions—including being denied direct contact to with CFM's trading desk by his account advisor on

25

December 13, 2022—CFM refused to execute the purchase of the additional put options. On information and belief, Credit Agricole interfered with the increase in the pledge value and the execution of the put transaction, and the transaction never occurred leaving the collateral coverage in jeopardy.

107.    These facts demonstrate that Credit Agricole exercised direct operational control and oversight over CFM's management of Plaintiffs' account, collateral decisions, and response to the margin call that Defendants had engineered through the defective Hedging Strategy Transactions.

108.    Credit Agricole's interference prevented Plaintiffs from curing the artificial shortfall that Defendants had created, thereby ensuring the very margin call and forced liquidation of the Collateral Securities that Defendants had repeatedly promised would never occur. This coordinated refusal formed part of the overarching scheme by Defendants to maintain an artificial shortfall, block remedial action, and ultimately liquidate Plaintiffs' U.S.-listed Collateral Securities through Defendants' New York entities, CACIB and CA Securities USA.

109.    On December 20, 2022, Plaintiffs sent CFM attestations from independent financial professionals confirming that the 2 million EUR transaction of May 2021 was a swap with no possibility of net loss and not a forward exchange generating losses as the bank had accounted for it. Defendants ignored these statements.

110.    On December 21, 2022, CFM continued to pressure Plaintiffs to post additional collateral or agree to sell shares to satisfy that margin call.

111.    On December 23, 2022, Mr. Berger met in person with Mr. Grégoire Faure (Deputy Chief Executive Officer) and Ms. Stéphanie Tallois (Head of Legal) at CFM's premises in order to find an amicable solution avoiding the enforcement of the collateral.

26

112.    On December 28, 2022, during a telephonic conversation that Mr. Berger received when he was in New York, Mr. Faure threatened Mr. Berger with the cancellation of his loans and the liquidation of his assets unless he immediately accepted the conclusions of an unknown financial expert, who had not yet been appointed to analyze the disputed transactions.

113.    Also on December 28, 2022, Plaintiffs received a letter from CFM containing a formal demand for repayment prior to the enforcement of their guarantees, *i.e.* the liquidation of the Collateral Securities.

114.    On January 20, 2023, the hedging operations of the forward exchange of 5,000,000 EUR and currency swap of 2,000,000 EUR matured crystallizing a loss on Plaintiffs' account of 708,000 USD. At the height of the EUR/USD exchange rate weakness following the Hedging Strategy Transactions, a mark-to market loss of up to 2,949,891 USD had negatively impacted Plaintiffs' account (including margin add-on), that would have required additional collateral equal to 5,363,438 USD to offset.

115.    Between January 2023, and October 2023, CFM and Plaintiffs failed to reach a formal agreement to appoint an independent financial expert. Following the breakdown in negotiations over the expert, Defendants requested a meeting between the parties to negotiate a settlement.

116.    On October 23, 2023, on the eve of settlement negotiations, Plaintiffs sent CFM the final Marcum report.

117.    CFM countered with their own expert report. The 8ADVISORY Report performed on behalf of CFM, dated February 24, 2024, reveals that CFM overvalued the Secured Claims by including the full 5,000,000 EUR valuation of the unsigned GAPD.

118.    The failure to deduct the valuation of the GAPD from the Secured Claims falsely

27

inflated their value above the value of the Collateral Securities and triggered an undeserved margin call ultimately leading to the liquidation of the Collateral Securities.

119.    As explained above, the April 20, 2021 forward contract of 5,000,000 EUR that exposed Plaintiffs to unnecessary FX risk to cover the GAPD had no reason to exist *ab initio*. But for this transaction made against Plaintiffs' interests, CFM would not have been motivated to remedy the hidden shortfall by pushing Plaintiffs to accept the "roll" of the Tesla options in September 2021 on the false promise that the transaction would generate liquidity.

120.    On February 27, 2024, Plaintiffs instructed CFM via email to execute a series of call options on Tesla shares to benefit from Tesla's appreciation in value. Like the November/December 2022 orders to purchase put options, Defendants refused to place Plaintiffs' orders. By failing to execute these orders, Defendants deprived Plaintiffs of protection against volatility specifically intended to address and cure the unjustified margin call and to reconstitute the collateral.

121.    On April 2, 2024, Plaintiffs received a formal notice demand for repayment prior to the enforcement within eight days of their guarantees, i.e. the liquidation of the Collateral Securities.

122.    On April 19, 2024, Defendants proceed to liquidate the Collateral Securities held in Plaintiffs' account and activates the guarantees, allocating all available balances in accounts to the repayment of credit exposures (the "Liquidation").

123.    CFM sold the shares through its affiliated entities in Credit Agricole, including CACIB and CA Securities USA. CA Securities USA is Credit Agricole's U.S. registered broker and is the entity that placed the sale trades of the Collateral Securities that ultimately harmed Plaintiffs in 2024.

124. Accordingly, Defendants scheme to force a margin call and liquidate Plaintiffs' Collateral Securities was always designed to flow through the U.S. and this District.

125. Since the Liquidation of the Collateral Securities, and despite numerous efforts, Plaintiffs have been unable to recoup their damages from Defendants.

126. In the aftermath of the misconduct alleged herein, Mr. Berger attended CFM's 2024 annual shareholder meeting as a shareholder. During the meeting, Mr. Berger publicly questioned CFM's Board of Directors, including Éric Vial, about CFM's conduct which led to the damages alleged herein. Upon information and belief, retaliatory actions taken against Mr. Berger following that meeting were done with the knowledge and at the direction of Mr. Vial. Significantly, Éric Vial was campaigning to become Chairman of the Board of Credit Agricole S.A., in addition to his role as role as Chairman of CFM's Board of Directors. Mr. Vial presently serves as the Chairman of the Board of Directors of Credit Agricole S.A. and the Chairman of the Board of Directors of CFM

127. In sum, Defendants operated a scheme whereby they fraudulently induced Plaintiffs into the Hedging Strategy Transactions, fraudulently induced Plaintiffs into underwater credit agreements, misrepresented the nature of the complex trading strategies, operated conflicted transactions for their own benefits, and engineered a margin call and the Liquidation of millions of dollars of the Collateral Securities.

## COUNT I – COMMODITY EXCHANGE ACT
### Violations of the Commodity Exchange Act

128. Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

129. Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25, codifies a private right of action under the of the Commodity Exchange Act providing that any person who violates the

Act or who willfully aids, abets, counsels, induces, or procures the commission of a violation of the Commodity Exchange Act is liable for actual damages resulting from specified transactions.

130.    Section 6(c)(1) of the Commodity Exchange Act, 7 U.S.C. § 9(1)(a), makes it unlawful for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . . .

131.    Regulation 180.1(a), 17 C.F.R. § 180.1(a), provides:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:
>
> 1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> 2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
>
> 3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

132.    As described above, the Defendants violated Section 6(c)(1) of the Commodity Exchange Act and CFTC Regulation 180.1(a) by, among other things, in connection with contracts of sale of commodities, making or attempting to make untrue or misleading statements of material fact or omitting to state or attempting to omit material facts necessary in order to make statements made not untrue or misleading.

133.    Defendants falsely represented that by agreeing to place the options and forward positions, Plaintiffs would face no margin call risk despite knowing that the executed structure mechanically increased Plaintiffs' liabilities as FX rates moved.

134.   Further, Defendants omitted material facts, including that (i) a €5 million "first demand guarantee" (GAPD) was never executed, (ii) FX forwards and equity options increased Plaintiffs' exposure rather than hedged it, (iii) Plaintiffs' multi-currency credit line was never actually hedged, (iv) internal valuations already showed a structural shortfall of the credit agreements from initiation, and (v) weighting and valuation assumptions were unilaterally altered by Defendants.

135.   Additionally, as described above, the Defendants violated Section 6(c)(1) of the Commodity Exchange Act and CFTC Regulation 180.1 (a) by, among other things, in connection with contracts of sale of a commodity, operating a fraudulent scheme whereby they would place FX transactions that would result in a margin call for Plaintiffs and force the liquidation of Plaintiffs' collateral holdings within this District.

136.   The actions caused actual damages to Plaintiffs. The Hedging Strategy Transactions caused tremendous damages to the balance of Plaintiffs' account as the EUR/USD exchange rate depreciated. The sum of the transactions described above directly led to the Liquidation of Plaintiffs' Collateral Securities causing Plaintiffs tens of millions of dollars in damages.

137.   The Defendants engaged in the acts and practices described above knowingly, willfully, intentionally, and/or recklessly.

138.   Credit Agricole, as the parent company of CFM, owned and controlled CFM.

139.   Even if Credit Agricole did not directly make the representations to Plaintiffs concerning the perfect hedge or no risk of margin call—and they did participate in the concealment of the underwater valuation of the May 2021 Credit Agreements—they were willful participants in the scheme, as discussed above, that resulted in the Liquidation of Plaintiffs'

Collateral Securities. These actions at least meet the threshold for one "who willfully aids, abets, counsels, induces, or procures the commission of a violation of the Commodity Exchange Act."

140.    By this conduct, the Defendants violated the Commodity Exchange Act.

## COUNT II – EXCHANGE ACT SCHEME LIABILITY
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and 10b-5(c)**

141.    Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

142.    Section 10(b) of the Exchange Act makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the SEC may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).

143.    Rule 10b-5, promulgated by the SEC pursuant to Section 10(b) of the Exchange Act, makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.

144.    This Count is brought under the provisions of Rule 10b-5(a) and (c). Accordingly,

Plaintiffs need not allege in this Count, nor prove in this case, that each of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

145. The Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive Plaintiffs; (ii) cause Plaintiffs to enter into the options and forward agreements antagonistic to their interests; (iii) trigger a margin call under the credit agreement; and (iv) caused the Liquidation of the Collateral Securities.

146. In furtherance of this unlawful plan, scheme, and course of conduct, the Defendants employed devices, schemes, and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs in connection with the Liquidation of the Collateral Securities in this District, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

147. The Defendants' fraudulent devices, schemes, artifices, and deceptive acts, practices, and course of business included falsifying losses to overstate Plaintiffs' liabilities, using artificial and blended exchange rates and valuations to undervalue Plaintiffs' collateral and conceal other losses, refusing to execute Plaintiffs' explicit trading instructions and hedge exposure against the unjustified margin-call, placing hedging transactions for their own benefit instead of Plaintiffs' benefit, and ultimately forced the liquidation of Plaintiffs' pledged securities, including 75,000 shares of Tesla stock causing tens of millions of dollars in damages.

148. Plaintiffs reasonably relied upon the numerous representations that the options and forward transactions were executed to eliminate risk, hedge their positions, and prevent a margin call and the Liquidation of the Collateral Securities.

149.    Plaintiffs were unaware of the Defendants' fraudulent scheme and unlawful course of conduct. Had Plaintiffs known of the Defendants' unlawful scheme and unlawful course of conduct, Plaintiffs would not have agreed to the series of events that triggered the margin call and the Liquidation of the Collateral Securities would not have occurred.

150.    As a direct and proximate result of the Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs suffered damages.

151.    By reason of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiffs for damages suffered in connection with the Liquidation of the Collateral Securities.

**COUNT III – EXCHANGE ACT STATEMENT LIABILITY**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**

152.    Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

153.    Section 10(b) of the Exchange Act makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the SEC may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

154.    Rule 10b-5, promulgated by the SEC pursuant to Section 10(b) of the Exchange Act, makes it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue

34

statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.14a-9.

155.    This Count is brought pursuant to Rule 10b-5(b) for false and misleading statements made to Plaintiffs that ultimately resulted in Liquidation of the Collateral Securities.

156.    Defendants falsely represented that by agreeing to place the forward positions, Plaintiffs would face no margin call risk despite knowing that the executed structure mechanically increased Plaintiffs' liabilities as the EUR deprecated against the USD.

157.    Moreover, Defendants omitted material facts, including that (i) a €5 million "first demand guarantee" (GAPD) was never executed, (ii) FX forwards and equity options increased Plaintiffs' exposure rather than hedged it, (iii) Plaintiffs' multi-currency credit line was never actually hedged, (iv) internal valuations already showed a structural shortfall of the credit agreements from initiation, and (v) weighting and valuation assumptions were unilaterally altered by Defendants.

158.    Plaintiffs reasonably relied upon the numerous representations that Defendants would place the transactions to hedge all FX and valuation risks and fully hedge the Collateral Securities.

159.    As a direct and proximate result of these false and/or misleading statements, Plaintiffs entered into the options and forward agreements antagonistic to their interests that triggered a margin call and caused the Liquidation of the Collateral Securities.

160.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange

Act and Rule 10b-5(b) promulgated thereunder and are liable to Plaintiffs for damages suffered in connection with the Liquidation of the Collateral Securities.

## COUNT IV – RECISSION UNDER THE EXCHANGE ACT
### Violations of Section 29(b) of the Exchange Act

161.    Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

162.    Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc, provides equitable remedies that include, among other things, the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

163.    As a result of their conduct, as alleged in this Complaint, Defendants violated Section 10(b) of the Exchange Act during the time they entered contracts with Plaintiffs regarding their loans, credit facilities, the Hedging Strategy Transactions, and the Liquidation of the Collateral Securities.

164.    Defendants violated provisions of the Exchange Act while performing their duties arising under various contracts they entered with Plaintiffs.  Indeed, the violations of Section 10(b) stemming from the use of false and misleading statements regarding the positioning of the forward positions directly tied to the Defendants' scheme to Liquidate the Collateral Securities.

165.    Plaintiffs were an innocent party with respect to Defendants' Exchange Act violations.

166.    Plaintiffs seek rescission of their contracts and the Liquidation of the Collateral Securities due to Defendants' violations of the Exchange Act while performing their duties. In the alternative, Plaintiffs seek rescissory damages.

## COUNT V - FRAUD
### Claim For Fraudulent Misrepresentation, Fraudulent Inducement, and Fraudulent Concealment

36

167. Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

168. Defendants made false representations of facts and/or omitted material facts while enticing Plaintiffs into their scheme, while executing the options, spot, swap, and forward contracts, throughout the term of the investments, and leading up to the Liquidation of Collateral Securities.

169. Defendants falsely represented that by agreeing to place the options, spot, swap, and forward contracts, Plaintiffs would have the perfect hedge and face no margin call risk despite knowing that the executed structure mechanically increased Plaintiffs' liabilities as the EUR depreciated against the USD.

170. Moreover, Defendants omitted material facts, including that (i) a €5 million "first demand guarantee" (GAPD) was never executed, (ii) FX forwards and equity options increased Plaintiffs' exposure rather than hedged it, (iii) Plaintiffs' multi-currency credit line was never actually hedged, (iv) internal valuations already showed a structural shortfall of the credit agreements from initiation, and (v) weighting and valuation assumptions were unilaterally altered by Defendants.

171. Defendants' misrepresentations were of material facts. Each fact was pertinent to Plaintiffs' transaction decisions.

172. At the time that the false representations were made, Defendants knew and/or recklessly disregarded that the representations were false.

173. Plaintiffs were ignorant of the falsity of the misrepresentations at the time they were made.

174. Defendants made the representations with the intent that Plaintiffs would rely

upon them to Plaintiffs' detriment and to Defendants' financial benefit.

175.    Plaintiffs relied on Defendants' misrepresentations by entering and executing the Credit Agreements and entering and executing the options, spot, swap, and forward contracts agreements. Plaintiffs only discovered that Defendants had made false representations years after the scheme when the scheme was nearly complete and Defendants forced a margin call and Liquidation of the Collateral Securities.

176.    Plaintiffs' reliance on Defendants' representations damaged Plaintiffs in an amount be determined at trial.

## COUNT VI - CONVERSION

177.    Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

178.    Plaintiffs owned, possessed, and/or had an ownership interest in the Collateral securities.

179.    Defendants intentionally and substantially interfered with Plaintiffs' ownership of, possession of, and/or right to possess the Collateral securities by causing the occurrence of a margin call and liquidating Plaintiffs' Collateral securities.

180.    Plaintiffs instructed Defendants that their errors were the cause of the risk exposure to the collateral and they were not entitled to liquidate Plaintiffs' Collateral securities.

181.    Defendants ultimately liquidated Plaintiffs' Collateral Securities causing Plaintiffs to lose their interests in the Collateral securities.

182.    Plaintiffs did not consent to the Liquidation.

183.    Plaintiffs were damaged in an amount to be determined at trial.

## COUNT VII – CIVIL THEFT

184. Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

185. Plaintiffs owned, possessed, and/or had an ownership interest in the Collateral Securities.

186. Defendants knowingly, and without authorization, liquidated Plaintiffs' Collateral Securities.

187. Defendants did so with the intent to permanently deprive the Plaintiffs of the use or benefit of the Collateral Securities.

188. Plaintiffs were damaged in an amount to be determined at trial.

## COUNT VIII – UNJUST ENRICHMENT

189. Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

190. Plaintiffs relied on Defendants for their expertise in complex securities and commodities transactions. Plaintiffs wanted a perfect hedge with no risk of margin call. Defendants promised to create for Plaintiffs a perfect hedge with no risk of margin call through a series complex securities and commodities transactions. Defendants acted conversely to their promises and the complex securities and commodities transactions resulted in increased exposure that directly led to a margin call and the forced Liquidation of the Collateral Securities.

191. Plaintiffs conferred a benefit upon Defendants in the form of the proceeds Defendants received from the Liquidation of the Collateral Securities.

192. Defendants retained the benefit by keeping the proceeds they received from the Liquidation of the Collateral Securities for themselves.

193. Defendants denied Plaintiffs' numerous attempts to prevent the Liquidation and

to retain their ownership of the Collateral Securities. Defendants further refused to compensate Plaintiffs for their losses.

194.    Defendants' retention of the proceeds they received from the Liquidation of the Collateral Securities and failure to pay Plaintiffs their duly owed compensation is unjust.

195.    Therefore, Defendants have benefited at Plaintiffs' expense and have been unjustly enriched.

196.    Accordingly, equity and good conscience require that Defendants pay restitution in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs prays for judgment and relief as follows:

A.    Entering judgment against Defendants for violations of the Commodity Exchange Act;

B.    Entering judgment against Defendants for violations of Sections 10(b) and 29(b) of the Exchange Act;

C.    Entering judgment against Defendants for committing fraud;

D.    Entering judgment against Defendants for conversion;

E.    Entering judgment against Defendants for civil theft;

F.    Finding that Defendants were unjustly enriched at the expense of Plaintiffs;

G.    Awarding Plaintiffs compensatory damages, punitive damages, and/or restitution to be proved at trial which Plaintiffs suffered as a result of Defendants' violations of the Commodity Exchange Act, the Exchange Act, fraudulent conduct, conversion, civil theft, and/or unjust enrichment, plus pre-judgment and post-judgment interest and costs;

H.    Rescinding the contracts between Plaintiffs and Defendants that led to the

Liquidation of the Collateral Securities, the Liquidation of the Collateral Securities, and/or rescissory damages for the Liquidation of the Collateral Securities.

I.      Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and/or

J.      Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: April 17, 2026                 Respectfully submitted,

**HACH ROSE SCHIRRIPA & REHNS LLP**

*/s/ Daniel B. Rehns*
   Daniel B. Rehns
   John W. Baylet
112 Madison Avenue, 10th Floor
New York, New York 10016
Tel: 646-992-8123
drehns@hrsrlaw.com
jbaylet@hrsrlaw.com

*Attorneys for Plaintiffs*